2000 UT 7

Agnes PEIRCE, individually and as personal representative of the Estate of Edward Eldred Peirce, Plaintiff and Appellant,

v.

Robert PEIRCE and Lisa Peirce, Barry Peirce, Boyd Marsing, Billy Troy Kennick, Michael Dmitrich, and Richard Borrell, Defendants and Appellees.

No. 981476.

Supreme Court of Utah.

Jan. 11, 2000.

---

Charles M. Bennett, Salt Lake City, for plaintiff.

John G. Mulliner, Provo, for defendants.

RUSSON, Justice:

¶ 1 Plaintiff Agnes Peirce appeals from a trial court judgment denying her claim for the imposition of a constructive trust and allowing defendants Robert and Lisa Peirce to retain property conveyed to them by Edward Eldred ("Ted") Peirce.[1] At issue is the interpretation of a written agreement that Ted Peirce and Agnes Peirce entered into during their marriage.

## BACKGROUND

¶ 2 Ted and Agnes Peirce were married on February 5, 1977, following a ten-year relationship, and were husband and wife at the time of Ted's death on July 11, 1993. Throughout most of their sixteen-year marriage, Agnes worked full time in a coal mine near their home in Price, Utah. Ted herded sheep for some time on their farm but was unemployed during most of their years together.

¶ 3 Sometime in 1985, Ted and Agnes executed a written agreement regarding the disposition of their property. Ted agreed in the writing to leave his estate to Agnes at his death. In exchange for his promise, Agnes gave all of her paychecks to Ted, keeping only a small amount of spending money for personal use. The whereabouts of the written agreement are now unknown.

¶ 4 Several years after Ted entered into this agreement with Agnes, and less than two months before he died, Ted left Agnes and moved in with his nephew, defendant Robert Peirce, and Robert's wife, defendant Lisa Peirce. During this same general period of time before his death, Ted made four gratuitous conveyances of real property and shares of stock to defendants.[2]

---

1. The record alternately refers to Mr. Peirce as Edward Eldred Peirce and Eldred Edward Peirce.

2. Prior to his death, Ted also made numerous conveyances of property to additional individuals formerly named as defendants to this action, including Barry Peirce, Boyd Marsing, Billy Troy Kennick, Michael Dmitrich, and Richard Borrell.

A default judgment was entered against Barry Peirce; Marsing was granted summary judgment; Agnes settled with Kennick and Dmitrich; and Agnes does not appeal as to Borrell. Thus, Agnes appeals the decision of the trial court only as to Robert and Lisa Peirce. Four particular gratuitous conveyances from Ted to Robert and Lisa Peirce are at issue in this appeal.

¶ 5  After Ted's death, Agnes, individually and as personal representative of Ted's estate, filed this action for constructive trust against defendants, alleging that Ted conveyed property to them in violation of his agreement with Agnes. Agnes alleged that the terms of the writing implicitly required Ted to obtain her consent before he conveyed any of his property. Defendants, in contrast, claimed that the conveyances from Ted did not violate the agreement.

¶ 6  The parties tried this case before a jury, which issued a special verdict stating in pertinent part that "Eldred Edward Peirce sign[ed] a written agreement with the Plaintiff wherein he agreed to leave all his assets to Plaintiff when he died." The jury also found, however, that while "Plaintiff fulfil[led] her obligations under that written contract," Ted did not "breach that written agreement when he transferred property to Defendants." Having found that Ted did not breach the agreement, the jury did not reach the issue of whether a constructive trust should be imposed on the property transferred to defendants.

¶ 7  After the jury issued its special verdict, Agnes moved the court to enter judgment on her behalf under rule 52 of the Utah Rules of Civil Procedure.[3] Agnes asserted that because she sought a remedy in equity, the jury acted only in an advisory capacity and, therefore, the findings of the jury did not preclude the trial court from imposing a constructive trust. In response, defendants urged the court to enter judgment in accordance with the jury verdict. They alleged that the jury verdict was binding because (1) one of the jury instructions, to which Agnes failed to object, stated that the jury would be the sole fact finder; and (2) the jury's finding of no breach bound the court in deciding any equitable issues. In addition, defendants argued that even if the jury verdict did not bind the court, no constructive trust could be imposed absent a showing of wrongdoing on the part of defendants.

¶ 8  The court denied Agnes's motion and issued findings of fact, conclusions of law, and judgment in conformance with the jury verdict. The findings of fact stated in pertinent part: "Sometime during the marriage, Eldred Edward Peirce by written agreement, agreed with Plaintiff that he would leave her his estate when he died." The court then concluded as a matter of law that Ted "was legally entitled to make transfers of his property prior to his death" and that Agnes was not entitled to a constructive trust "whether the jury is fact finder or advisory only."

¶ 9  On appeal, Agnes claims that the trial court interpreted the agreement between her and Ted in such a manner as to render illusory Ted's promise to leave her his estate. To make the agreement enforceable, she asserts that the trial court should have found an implied term in the agreement that restricted Ted from transferring his property without Agnes's consent. Agnes also claims that Ted's conveyances to defendants violated the implied covenant of good faith and fair dealing. She argues that the appropriate remedy for these violations is the imposition of a constructive trust upon the property that Ted conveyed to defendants.

¶ 10  Defendants respond that (1) Agnes failed to preserve below the issues she now raises on appeal; (2) the trial court was bound by the jury's findings; (3) Agnes failed to marshal the evidence; (4) the agreement was not illusory; and (5) there is insufficient evidence of a breach of the covenant of good faith and fair dealing.

### PRELIMINARY ISSUES

¶ 11  Before addressing the substantive issues that Agnes raises, we must resolve two preliminary issues: (1) whether the jury verdict was advisory or binding; and (2) whether Agnes properly preserved below the issues she now raises on appeal.

### I.  ROLE OF THE JURY

¶ 12  We must first decide whether the findings of the jury are binding. In

---

3.  Rule 52 provides in pertinent part, "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58A...." Utah R. Civ. P. 52(a).

other words, we must determine whether the jury served in an advisory capacity or whether this case was tried by a jury as of right. If the jury was merely advisory, its verdict was not binding upon the trial court. *See Romrell v. Zions First Nat'l Bank,* 611 P.2d 392, 394 (Utah 1980). The determination of whether a jury was merely advisory or acting as of right depends in part upon whether the plaintiff seeks a remedy at law or in equity:

> "When a jury is used in an equity case, it acts in an advisory capacity. It is true that when the court has sought the aid of a jury, it should give due consideration to the jury's findings or conclusions, and not disregard them lightly. Nevertheless, in such cases, it is still his prerogative to accept or reject the findings or conclusions of the jury in accordance with the dictates of his own conscience."

*Id.* (quoting *Kesler v. Rogers,* 542 P.2d 354, 358–59 (Utah 1975)). Thus, where an equitable remedy is sought, the trial court decides the issues and "[t]he jury's role is limited to aiding the court in its decision." *Id.* A constructive trust is an equitable remedy. *See Ashton v. Ashton,* 733 P.2d 147, 150 (Utah 1987); *In re Estate of Hock,* 655 P.2d 1111, 1114 (Utah 1982); Restatement of Restitution § 160 (1937). Thus, Agnes, who seeks a constructive trust, was not entitled to a jury trial as of right.

¶ 13   The Utah Rules of Civil Procedure add, however:

> In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.

Utah R. Civ. P. 39(c). Therefore, the jury verdict in this case could have been binding only if both parties had consented. Moreover, we have explained that, even under rule 39(c), "when there is a demand for a jury trial in an equity case, the jury will serve only in an advisory capacity unless both parties have *clearly consented* to accept a jury verdict." *Romrell,* 611 P.2d at 394 (emphasis added).

¶ 14   Defendants argue that Agnes did consent to a binding jury verdict when she failed to object to a stock jury instruction that characterized the jury as having the "exclusive duty to determine the facts in this case." We disagree. Failure to object to this particular standardized statement in the jury instruction cannot be interpreted as clear consent to a binding jury verdict. The instruction by itself could not actually alter the jury's role, and there is no indication that Agnes manifested any positive intent to be bound by the jury verdict as required by *Romrell* and rule 39(c). Furthermore, even if the trial court erred by instructing the advisory jury in such a manner, such an error was harmless in this case. The instruction could only have served to inspire the jury to take its role more seriously.

¶ 15   In addition, the record indicates that the trial court actually treated the jury as advisory. Under rule 52(a) of the Utah Rules of Civil Procedure, after nonjury or advisory jury trials, "the court shall find the facts specifically and state separate conclusions of law thereon." In addition, rule 58A states that judgments based on a jury verdict shall be signed by the court clerk, while judgments not based on the jury verdict must be signed by the judge. *See* Utah R. Civ. P. 58A(a)-(b). In this case, there was no judgment signed by the clerk. Rather, the trial judge entered separate findings of fact and conclusions of law and signed the judgment. In view of these facts, we hold that the jury served only in an advisory capacity, and we therefore afford no deference to the jury's findings.

## II.   PRESERVATION OF THE ISSUES

¶ 16   Before addressing the merits of this case, we must also examine whether Agnes preserved the issues she raises on appeal. Agnes raised the constructive trust issue in her complaint and at trial, and the issue of constructive trust appeared in the jury instructions and on the jury's special verdict form. In addition, Agnes raised the illusory promise and good faith and fair dealing issues in a memorandum submitted before the court issued its findings of fact and conclusions of law. Therefore, Agnes ade-

quately preserved the issues she raises on appeal, and we proceed to examine these issues.

## ANALYSIS

¶ 17 At issue in this case is the interpretation of Ted's agreement with Agnes. The trial court found that "[s]ometime during the marriage, Eldred Edward Peirce by written agreement, agreed with Plaintiff that he would leave her his estate when he died." The trial court then concluded as a matter of law that, under the agreement, "Eldred Edward Peirce was legally entitled to make transfers of his property prior to his death."[4] The litigants before us do not contest the finding that an agreement existed; the parties dispute, however, whether the court interpreted the agreement correctly. Agnes contends that the trial court erred and claims that the agreement restricted Ted from giving away a substantial portion of his property before his death. Defendants argue that the trial court correctly concluded the agreement permitted Ted to transfer property to them before his death.

¶ 18 We review the trial court's interpretation of the agreement for correctness, according no deference to the court's conclusions of law. See Zions First Nat'l Bank v. National Am. Title Ins. Co., 749 P.2d 651, 653 (Utah 1988) ("Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions we accord the trial court's interpretation no presumption of correctness."); R & R Energies v. Mother Earth Indus., Inc., 936 P.2d 1068, 1077 (Utah 1997); Sackler v. Savin, 897 P.2d 1217, 1220 (Utah 1995).

¶ 19 We have stated that "courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract." Resource Mgmt. Co. v. Weston Ranch & Livestock Co., 706 P.2d 1028, 1037 (Utah 1985). In addition, we interpret the terms of a contract in light of the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract. See Utah State Med. Ass'n v. Utah State Employees Credit Union, 655 P.2d 643, 646 (Utah 1982); Nixon & Nixon, Inc. v. John New & Assocs., Inc., 641 P.2d 144, 146 (Utah 1982). Moreover,

> where there is doubt about the interpretation of a contract, a fair and equitable result will be preferred over a harsh and unreasonable one. And an interpretation that will produce an inequitable result will be adopted only where the contract so expressly and unequivocally so provides that there is no other reasonable interpretation to be given it.

Plain City Irr. Co. v. Hooper Irr. Co., 11 Utah 2d 188, 192–93, 356 P.2d 625, 628 (1960) (footnote omitted); see First Sec. Bank of Utah v. Maxwell, 659 P.2d 1078, 1081 (Utah 1983); Wingets, Inc. v. Bitters, 28 Utah 2d 231, 236, 500 P.2d 1007, 1010 (1972).

¶ 20 We also must examine the special rules that govern our analysis of postnuptial agreements. Postnuptial agreements are a type of contract and are generally subject to basic contract principles. See In re Estate of Beesley, 883 P.2d 1343, 1351 (Utah 1994). We have noted, however, in the context of prenuptial agreements, that important differences exist between marital agreements and commercial contracts:

> Parties to premarital agreements do not deal with one another at arm's length. Unlike a party negotiating at arm's length, who generally will view any proposal with a degree of skepticism, a party to a premarital agreement is much less likely to critically examine representations made by the other party. The mutual trust between the parties raises an expectation that each party will act in the other's best interest. The closeness of this relationship, however, also renders it particularly susceptible to abuse. Parties to premarital agreements therefore are held to the highest degree of good faith, honesty, and

---

4. Defendants allege that Agnes fails to marshal the evidence in support of her appeal. However, the trial court's determination that Ted was free to give away his property before his death is a conclusion of law, and the marshaling requirement applies only to challenges of factual findings, not to conclusions of law. See Young v. Young, 979 P.2d 338, 344 (Utah 1999).

candor in connection with the negotiation and execution of such agreements.

*Id.* at 1346; *see also* 41 C.J.S. *Husband & Wife* § 87 (1991) ("Since a husband and wife do not deal at arm's length, a fiduciary duty of the highest degree is imposed in transactions between them."). Postnuptial agreements are generally scrutinized under the same standards as those applied to prenuptial agreements. *See Reese v. Reese,* 984 P.2d 987, 994–95 (Utah 1999); *D'Aston v. D'Aston,* 808 P.2d 111, 112–13 (Utah Ct.App. 1990). Therefore, in examining the agreement between Ted and Agnes, we are careful to ensure that neither has abused his or her mutual trust and fiduciary duty.

¶ 21 Because a postnuptial agreement is subject to contract principles, it must be supported by adequate consideration. *See Beesley,* 883 P.2d at 1351; *D'Aston,* 808 P.2d at 112–13. Consideration may be found when there is any act or forbearance bargained for and given in exchange for the promise of another. *See Resource Mgmt.,* 706 P.2d at 1037. Whether an act or forbearance constitutes consideration for a contract is a question of law that we review for correctness. *See id.* We have held that

> [f]or the mutual promises of the parties to a bilateral contract to constitute the consideration for each other, the promises must be binding on both parties. When there exists only the facade of a promise, i.e., a statement made in such vague or conditional terms that the person making it commits himself to nothing, the alleged "promise" is said to be "illusory." An illusory promise, neither binds the person making it, nor functions as consideration for a return promise.[5]

*Id.* at 1036 (citations omitted). It has also been noted, however, that

> [t]he tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract. Through a

process of interpretation, in the absence of express restrictions, courts find implied promises to prevent a party's promise from being performable merely at the whim of the promisor.

2 Perillo & Bender, *supra,* note 5, § 5.28, at 149. Furthermore, we note the general principle of contract interpretation set forth in the Restatement: "In the interpretation of a promise or agreement or a term thereof, . . . an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203 (1981).

¶ 22 We now examine the agreement between Ted and Agnes with these principles in mind. The court below, relying upon the advisory jury verdict, found that Ted and Agnes entered into an enforceable agreement. The trial court's conclusion that the agreement was a valid, enforceable contract necessitates a preliminary conclusion that consideration supported the agreement. In other words, to conclude that the agreement constituted a valid contract, the court must have first concluded that both Ted and Agnes provided consideration to support their promises to perform.

¶ 23 There is no dispute that Agnes agreed to give valuable consideration. She agreed to give all of her future regular paychecks to Ted, withholding only a small portion as a sort of allowance. The nature of the consideration provided by Ted, however, is hotly disputed.

¶ 24 Both parties agree that Ted's promise to give Agnes "his estate" upon his death constitutes the consideration he provided. The parties disagree as to the meaning of "estate" for purposes of the contract. Agnes, on the one hand, contends that Ted's promise to leave his estate to her necessarily implies that he would not give away a substantial portion of that estate in a manner that avoid-

---

5. "By the phrase 'illusory promise' is meant words in promissory form that promise nothing." 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on Contracts* § 5.28, at 142 (rev. ed.1995). "One of the commonest kinds of promises too indefinite for legal enforcement is where the promisor retains an unlimited right to decide later the nature or extent of his performance. This unlimited choice in effect destroys the promise and makes it illusory." Samuel Williston, *The Law of Contracts* § 43, at 140 (3d ed.1957).

ed his obligations under the agreement. Defendants, on the other hand, argue that Ted's "estate" simply consisted of whatever property happened to be left in his possession when he died. Under this definition of "estate," Ted was free to dispose of whatever he pleased, either by gift or by will, to whomever he pleased.

¶ 25 The trial court agreed with defendants' interpretation. The trial court concluded that, absent any express term to the contrary, Ted was legally entitled to make gratuitous transfers of his property prior to his death. If this conclusion were correct, however, Ted would not have provided any consideration at the time he entered into the agreement with Agnes. Because Ted had no children from a prior marriage, his intestate estate (i.e., whatever happened to be in his possession at the time of his death) would have gone to Agnes. *See* Utah Code Ann. §§ 75–2–101 to –102 (Supp.1999) (providing that any part of decedent's estate not disposed of by will passes to surviving spouse if there are no surviving descendants of decedent). The only means by which Ted could deprive Agnes of his worldly possessions, then, would be to give them to someone else prior to his death, or dispose of them by will. Hence, the only possible consideration that he could have provided for Agnes's agreement to give him all of her future paychecks was a promise to forbear from transferring substantial portions of his estate to someone else by gift or will.[6]

¶ 26 Absent any restriction upon his ability to transfer his property by will, gift, or otherwise, Ted essentially would have given no consideration. Rather, his promise to leave his estate to Agnes would be an empty, illusory promise, performable at his own whim and caprice. Thus, under the trial court's interpretation of the agreement, no consideration existed upon which to create an enforceable contract.

¶ 27 We therefore conclude that the trial court erred in its interpretation of the agreement. The court could not find that a valid contract existed in which Ted agreed to leave

his estate to Agnes and then conclude, in effect, that Ted was at liberty to gratuitously dissipate that estate. Rather, the consideration for which Agnes bargained—and for which she supported Ted throughout their marriage—must have been Ted's forbearance from giving away substantial portions of his property before his death. Otherwise, their agreement would be unsupported by consideration because it would permit Ted to arbitrarily avoid performance of his side of the bargain. The trial court's interpretation of the agreement would also ignore Ted's overriding fiduciary duty to Agnes in entering into a postnuptial agreement.

■■ ¶ 28 Thus, we conclude that the agreement included limitations upon Ted's ability to give away substantial portions of his property, as circumscribed by the fiduciary duty and mutual trust that governs postnuptial agreements. Accordingly, we reverse the judgment of the court below and remand for a determination of whether the value of the four gifts that Ted made to defendants exceeded the limitation the agreement placed upon his ability to give away substantial portions of his property. If these transfers indeed violated the agreement, then the court can impose a constructive trust as dictated by the principles of equity.

¶ 29 Chief Justice HOWE, Associate Chief Justice DURHAM, and Justice STEWART concur in Justice RUSSON's opinion.

¶ 30 Justice ZIMMERMAN concurs in the result.

---

6. Agnes does not argue that Ted could not give gifts of the type ordinarily bestowed in daily life, or even that he could not sell his property for fair market value. Rather, she asserts that Ted agreed not to give away substantial portions of his estate prior to his death.